## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| JOSEPHINE DUENAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| OPPENHEIMERFUNDS, INC., | ) | |
| a Colorado Corporation, | ) | |
| OPPENHEIMERFUNDS DISTRIBUTOR, | ) | |
| INC., a New York Corporation, and | ) | **JURY TRIAL REQUESTED** |
| ANGELO MANIOUDAKIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Josephine Duenas, by and through her attorneys, Stoltmann Law Offices, P.C. and Higgins & Burke, P.C., brings this Complaint at law against defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc. and Angelo Manioudakis, and states as follows:

## Parties

1. Plaintiff Josephine Duenas (hereinafter "Mrs. Duenas" or "Plaintiff") is an individual who at all times relevant resided in Toms River, New Jersey. As of the date of the filing of this complaint, Mrs. Duenas intends to remain in Ne Jersey indefinitely and is domiciled in the State of New Jersey.

2. Defendant OppenheimerFunds, Inc. (hereinafter "Defendant" or "OFI") is a Colorado corporation with its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor in New York, New York. OFI was the manager and investment advisor of the Oppenheimer Champion Income Fund (hereinafter the "Fund" or the "Champion

Income Fund") and handled the day-to-day management of the Fund at all times relevant. OFI earned a fee for its management of the Fund.

3.    Defendant OppenheimerFunds Distributors, Inc. (hereinafter "Defendant" or "OFDI") is a New York corporation with its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor in New York, New York.  OFDI is a subsidiary of OFI and was the principal underwriter and distributor of the Champion Income Fund at all times relevant.  OFDI and OFI are sometimes collectively referred to as "Oppenheimer."

4.    Defendant Angelo Manioudakis (hereinafter "Defendant" or "Defendant Manioudakis") is an individual and resides in Boston, Massachusetts.  Defendant Manioudakis is believed to be physically present in the State of Massachusetts and domiciled in the State of Massachusetts.  Defendant Manioudakis was previously the portfolio manager of the Champion Income Fund and was employed by OFI and OFDI.  Upon information and belief, Manioudakis was a Vice-President of OFI.  Manioudakis took over the day-to-day management of the Fund in late 2006 and was responsible for the Fund's management until his termination in December 2008.

## Jurisdiction and Venue

5.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the Defendants did business in this district, sold investment products in this district, and the misleading materials at issue were believed to be prepared and drafted in this district.

6.    Plaintiff Josephine Duenas is domiciled in the State of New Jersey and is a citizen of the State of New Jersey.

7.    Defendant OFI has its principal place of business in the State of New York, is

incorporated under the laws of the State of Colorado, and is therefore a citizen of the States of New York and Colorado.  Defendant OFDI has its principal place of business in the State of New York, is incorporated under the laws of the State of New York, and is therefore a citizen of the State of New York.  Defendant Manioudakis is domiciled in the State of Massachusetts and is a citizen of the State of Massachusetts.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the plaintiff and all defendants, and the amount in controversy exceeds $75,000.

## Fact Common to All Counts

9.    The Oppenheimer Champion Income Fund is an open-ended management investment company registered with the Securities and Exchange Commission.  This Fund sold five classes of shares, including Class A, B, C, N, and Y.

10.    The Fund has no employees.  Instead, the Fund is managed by an investment manager (in this case, OFI) under a management contract that is approved by the Fund's Board of Trustees.  In return, OFI provides employees, including Manioudakis, to act as the Fund's officers and manage the fund.

11.    OFI is responsible for making all day-to-day investment decisions for the Fund, including decisions as to what assets the Fund will invest in.  Defendant Manioudakis headed the team of OFI employees that made these day-to-day decisions for the Fund.

12.    OFDI is the principal underwriter and distributor of the Fund's shares.  OFDI typically has selling arrangements with securities broker-dealers who then sell the Fund to investors.  OFDI helped draft the public offering and registration documents and other marketing materials sent to the investing public.

13.     Upon information and belief, OFDI had a selling arrangement with Family Investors Company to sell Oppenheimer mutual funds to investors.

14.     The Plaintiff purchased shares of the Oppenheimer Champion Income Fund through Russell Whittaker of Anchor National Joseph Chemidlin.

15.     Mr. Chemidlin solicited the Plaintiff to invest in the Champion Income Fund from his office, which is located in Fanwood, New Jersey.  When recommending to the Plaintiff to purchase these shares, it is believed that Mr. Chemidlin relied upon information that was given to him from OFI and OFDI.

16.     Chemidlin in turn communicated to the Plaintiff in general terms that he believed the Champion Income Fund was safe.

17.     The Plaintiff relied upon the information that was given to her by OFI and OFDI when deciding to invest in Champion.  The Plaintiff believed that this Fund was relatively safe, generated high income, and that it had the normal risks associated with a typical high yield bond fund.  However, the Plaintiff was not aware of the extreme risk that this Fund was taking on.

18.     OFI and OFDI substantially misrepresented the highly speculative nature of the Champion Income Fund.  The risks of this Fund were materially misrepresented to the investing public, including the Plaintiff.

19.     Moreover, Manioudakis, as agent for OFI and OFDI, mismanaged the Champion Income Fund.  He did not invest the Fund's assets in a safe, prudent manner and recklessly made the Fund very risky.

20.     Manioudakis also exceeded the parameters of the Fund as outlined in the Fund's prospectus and Statement of Additional Information when he concentrated the underlying

assets of the Fund in the mortgage industry, and when he used more leverage in the Fund

than was allowed.

21.     In 2008, the value of the Champion Income Fund's shares dropped approximately 80

percent, with staggering losses of nearly 55% in the month of November 2008 alone.  As

the value of these shares fell, so did the value of each of the Plaintiff's investment in the

Champion Income Fund.

22.     The Champion Income Fund was portrayed by the Defendants as a relatively safe bond

mutual fund that did not involve "undue risk."   For example, the August 7, 2006

prospectus states:

> WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary
> objective is to seek a high level of current income by investing mainly in a **diversified
> portfolio** of high-yield, lower-grade, fixed-income securities that the Fund's investment
> manager, OppenheimerFunds, Inc. (the "Manager"), believes **do not involve undue risk**.
> The Fund's secondary objective is to seek capital growth when consistent with its
> primary objective.
>
> * * *
>
> WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors
> seeking high current income from a fund that invests mainly in lower-grade domestic and
> foreign fixed-income debt securities.  Those investors should be willing to assume the
> greater risks of short-term share price fluctuations that are typical for a fund that invests
> mainly in high-yield domestic and foreign fixed-income debt securities, which also have
> special credit risks.  Since the Fund's income level will fluctuate, it is not designed for
> investors needing an assured level of current income.  The Fund is intended to be a long-
> term investment and **may be appropriate as a part of a retirement plan portfolio**.  The
> Fund is not a complete investment program.
>
> See August 7, 2006 Prospectus (emphasis added).

23.     Similar representations were made in prospectuses as far back as January 2001 and up

through and including January 2008.  The prospectuses make no disclosures that this

Champion Income Fund was dramatically riskier than the peer group of high yield bond

mutual funds.

24.     The Defendants portrayed the Fund to be a conservative or safe bond fund.  As an example, as of December 31, 2007, the Oppenheimer Conservative Investor Fund had approximately 11% of its internal holdings invested in the Champion Income Fund.

25.     OFI and OFDI portrayed a high-yield fixed-income mutual fund to be relatively safe to the investing public.  For example, in an Oppenheimer brochure entitled "Saving for Retirement: How to Make the Most of Your Company's Plan" dated February 21, 2005, Oppenheimer compared high-yield fixed-income mutual funds to other equity-based mutual funds.  This article is attached hereto and incorporated by reference as **Exhibit 1**. Page 13 of this article presents a chart showing the relative degrees of risk in a mutual fund – from cash as being the most conservative to global and international equity mutual funds being the most aggressive and riskiest mutual funds.  The chart shows that Oppenheimer considers high-yield fixed-income mutual funds (like the Champion Income Fund) to be less aggressive and more conservative than any equity mutual funds.

26.     The Champion Income Fund was anything but safe, and any representations to the contrary made by the Defendants were false.

27.     The Defendants failed to accurately represent the risks and characteristics of the Champion Income Fund and misled investors, including the Plaintiff.

28.     The representations made by the Defendants were false and misleading for a number of reasons:

a)       The Fund pursued risky trading strategies beginning in late 2006 when Defendant Manioudakis started concentrating the Fund's assets in speculative mortgage-backed securities and derivative investments;

b)      The Fund's strategy created an undue amount of risk and did not adequately disclose the illiquid nature of these derivatives and mortgage-backed securities;

c)      The Fund failed to disclose the extent to which the assets in the Fund were exposed to leverage, thereby increasing the risk;

d)      The Fund failed to disclose the risks related to concentrating the Fund's assets in one particular industry or in one type of investment;

e)      The Fund exceeded the allowable amount of "illiquid" or "restricted" securities that the Fund could invest in; and

f)      The Fund did not identify the tranches of the derivatives being purchased by the Fund and failed to address the significantly different risks and characteristics of lower-level tranches as compared to higher-level tranches.

29.     The Fund's new trading strategy beginning at the end of 2006 and continuing through the end of 2008 gambled on these derivatives and mortgage-backed securities, but the Defendants failed to adequately inform investors of this new strategy.  The Defendants failed to inform the Plaintiff and other investors that this new trading strategy was dramatically riskier than those previously used.

30.     As part of this new strategy, the Champion Income Fund began investing in total-return swaps.  Total-return swaps are highly illiquid, speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities performs. Specifically, the Fund was betting that top-rated commercial mortgage-backed securities would rally in 2008. The Fund gambled on these total-return swaps and lost.

31.     In addition to investing in total-return swaps as part of this new trading strategy, the Champion Income Fund was also concentrated in credit-default swaps ("CDSs"). CDSs

are similar to insurance contracts that protect investors against bond and loan defaults (or other specified credit events like bankruptcy or restructuring). In exchange for being responsible to pay out for such issues, CDS sellers receive a stream of interest payments from the CDS buyers.  It is not necessary for the buyer to own the underlying credit instrument to buy these CDSs.  **The CDSs in the Champion Fund declined $238 million through September 2008 alone**, adversely impacting thousands of investors who had invested in the Champion Income Fund not knowing the extent of the high-risk, inappropriate gamble taken by the Defendants**.**

32.     Selling CDSs is extremely risky and speculative when insuring companies are already struggling with credit problems.  Through at least September 2008, the Fund was selling CDSs on troubled companies including Lehman Brothers Holdings Inc., American International Group Inc., General Motors Corp. and newspaper company Tribune Co. Many of those firms have collapsed, filed for bankruptcy, or otherwise had problems leaving holders of the Champion Income Fund financially devastated.  The risks of these securities were well known to the Champion Income Fund managers prior to the Fund's meltdown occurring, but the extent of this risk was not adequately disclosed to the Plaintiff.

33.     While the Champion Income Fund can invest in derivatives, the Fund took a massive bet in some of the riskiest derivative tranches available. These risks were not adequately disclosed to purchasers in any other manner than cursory, boilerplate disclosures.  No specific detailed risk disclosures were provided.  These derivatives added leverage to the Fund because they allowed the Fund to bet on more securities than they actually hold in the portfolio. This exacerbated losses when the Fund was already declining. The risks of

the Fund made them much more similar to hedge funds than the high and aggregate income funds they were portrayed to clients in offering and marketing materials.

34.     The Champion Income Fund also increased its gamble on falling mortgage related bonds in 2008.  For example, mortgage securities tied to Washington Mutual Inc. with a $9 million principal value were valued at only $3 million at the end of September 2008. A set of five Freddie Mac mortgage-backed securities with a combined principal amount of $20 million were valued at just $2.5 million. As defaults continued to rise, the mortgage related holdings plummeted. While this sort of sector bet might be appropriate for a sector fund or hedge fund, the Champion Income Fund was not meant to be a sector or hedge fund and was represented to investors as an appropriate investment for conservative investors.

35.     The Champion Income Fund's trading strategy exacerbated its losses when it made a sector bet in struggling Wall Street brokerage firms. For example, the Fund purchased Lehman Brothers bonds between June 1, 2008 and September 30, 2008 with $29 million in principal value. Lehman Brothers filed for Chapter 11 bankruptcy-court protection in mid-September 2008, and those bonds fell to just $144,000. The Champion Income Fund also added Morgan Stanley bonds with $13 million in principal during that period. The bonds were valued at approximately $8.3 million by the end of September 2008.  These investments may have been appropriate for a financial sector fund or aggressive growth fund but not for what was portrayed as a conservative bond fund.

36.     Pursuant to the parameters of the Fund as set forth in its prospectuses and Statements of Additional Information, the Fund was allowed borrow money up to 33.3% in excess of the total value of its assets.  However, the Fund exceeded this amount and were over-

leveraged.  "Leverage" refers to the use of borrowed money an in investing in effort to increase the Fund's returns; however, with a potential in this increased return also comes increased risk.  The credit default swaps, total return swaps, and derivatives that the Fund invested in were also leveraged.

37.  This increased leverage meant that the Fund took on substantially more risk than what was allowed.  When the value of the leveraged assets within the Fund dropped, this exacerbated the losses.

38.  For example, it is believed that the Champion Income Fund had approximately $2 billion in net assets in March 2008.  It is also believed that the Champion Income Fund had used $3.2 billion of leverage through the use of these derivatives.  Thus, the Champion Income Fund borrowed more than 100% of its total value of assets, significantly higher than the 33.3% that was allowed.

39.  Similarly, the Champion Income Fund was allowed to invest up to 25% of its assets in one industry.  However, it is believed that the Champion Income Fund had a huge over-concentration in the mortgage industry, well above this 25% amount.   Again, Manioudakis invested the assets of the Fund beyond what was allowed.

40.  Likewise, the Champion Income Fund was allowed to invest up to 10% of its assets in "illiquid" or "restricted" securities – securities which have no active trading market, making it difficult to dispose of them promptly or at an acceptable price.  Manioudakis invested the Fund's assets in illiquid or restricted securities beyond this 10% threshold, in violation of the prospectus and Statement of Additional Information.

41.  The Defendants are likely to argue that the 2008 subprime mortgage collapse affected the market as a whole.  However, a comparison of the Champion Fund to aggregate bond

indices shows how horrific the Champion Income Fund's performance was. For example, compare the class A shares of the Champion Income Fund to Lehman Brothers' Aggregate Bond Index in the chart below:



*Mrs. Duenas' Investments*

42.     Mrs. Duenas invested in the Oppenheimer High Yield Fund. Mrs. Duenas then purchased 17,197.040 shares of the Champion Income Fund for an investment of $160,964.29 on October 17, 2006 when her High Yield Fund shares converted into Champion Income Fund A Shares.

43.     Mrs. Duenas also reinvested her dividends.

44.     To date, Mrs. Duenas has lost approximately $130,000 in the Champion Income Fund.

45.     In a letter dated September 26, 2008, John Murphy, the Chairman and CEO of OFI sent a letter out to the Oppenheimer clients, including those like the Plaintiff who invested in

the Champion Income Fund. This letter encouraged investors to stay invested in the Oppenheimer mutual funds, even as they continued to plummet in value. The letter states:

You and I, along with mutual fund investors across the country are facing the most challenging market environment in recent memory. Each day, it seems we awake to a new distressing headline. **This can make it all too easy to become swept up by the panic of the moment, lose sight of our long-term goals and abandon our well-considered financial strategies**.

**The importance of discipline**
Unfortunately, I can't say for sure when the markets will regain their footing. **However, I can tell you that times of uncertainty are not times to make dramatic shifts in your portfolio. Historically speaking, those who have had the discipline and perseverance to stick to their objectives and maintain a well-diversified portfolio have ultimately been rewarded.**

That's why our investments teams, composed of experienced analysts and portfolio managers, **operate with a long-term view of the economy and the financial markets. Rather than reacting to short-term events, or chasing performance, they take a steady, measured approach to portfolio management**. Each fund's management team adheres to the mandates laid out in the fund's prospectus and the investment strategies that have created value for shareholders over time.

**Remember: You're not in this alone**
At OppenheimerFunds, we recognize that you have entrusted your money to us as part of a strategy to build a sound financial future. This is a trust we take very seriously and one with which we can identify. **Our employees and their families, as well as the Trustees/Directors of the Oppenheimer funds, have over $3 billion of their money invested alongside yours in the Oppenheimer funds**. We work diligently so that our shared investments may help us all attain our financial goals.

A copy of this September 26, 2008 letter is attached hereto as **Exhibit 2** (emphasis added).

46.    Representations like this caused the Plaintiff and other investors to stay invested in the Champion Income Fund, and caused them to incur further losses as the value of Champion substantially decreased.

47.    Based on the information provided by OFI and OFDI, Mrs. Duenas believed that there

was minimal risk in the Champion Income Fund.

## COUNT I – New Jersey Uniform Securities Law of 1997
### (Plaintiff v. All Defendants)

48.    Plaintiff Josephine Duenas restates and realleges paragraphs 1 through 47 as though fully

stated herein as paragraph 48.

49.    At all times material herein, there existed in the New Jersey Uniform Securities Law of

1997, Section 49:3-47 *et seq.* ("NJUSL").  Section 49:3-52 of the NJSUL states in part

that:

> It shall be unlawful for any person, in connection with the offer, sale, or
> purchase   of   any   security,   directly   or   indirectly
>
> (a)  To  employ  any  device,  scheme,  or  artifice  to  defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light
> of  the  circumstances  under  which  they  are  made,  not  misleading;
>
> (c) To engage in any act, practice, or course of business which operates or
> would   operate   as   a   fraud   or   deceit   upon   any   person;
>
> (d) To fail to deliver the prospectus filed under the "Securities Act of
> 1933" to each purchaser of a security registered under that act, in
> accordance with the prospectus delivery requirements of that act.

See N.J. Stat. § 49:3-52.

50.    Section 49:3-71 of the NJUSL provides:

(a) Any person who

> (1) Offers, sells or purchases a security in violation of subsection (b) of
> section 8, subsection (a) of section 9 or section 13 of P.L. 1967, c. 93 (C.
> 49:3-55, 49:3-56, or 49:3-60), or
>
> (2) Offers, sells or purchases a security by means of any untrue statement
> of material fact or any omission to state a material fact necessary in order
> to make the statements made, in the light of the circumstances under
> which they are made, not misleading (the buyer not knowing of the

untruth or omission), or

(3) offers, sells or purchases a security by employing any device, scheme, or artifice to defraud, or

(4) offers, sells or purchases a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person . . .

(5) engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, **is liable as set forth in subsection (c) of this section**;

(c) Any person who offered, sold or purchased a security or engaged in the business of giving investment advice to a person in violation of paragraph (1), (2), (3), (4) or (5) of subsection (a) of this section is liable to that person, who may bring an action either at law or in equity to recover the consideration paid for the security or the investment advice and any loss due to the advice, **together with interest** set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the investment advice or security, **and costs**, less the amount of any income received on the security, upon the tender of the security and any income received from the investment advice or on the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of disposition;

See N.J. Stat. § 49:3-71 (2007) (emphasis added).

51.     At all times mentioned herein the investments in the Champion Income Fund were "securities" within the definitions of the NJUSL.

52.     Defendants used deception, false promises, and misrepresentations to hide the full risks of the Champion Income Fund.

53.   Defendants, with knowledge of, or with unreasonable disregard for the truth, participated in a course of conduct whereby Plaintiff's funds were placed in jeopardy, then lost due to improper investments in extremely speculative securities.  Defendants knew, or should have known of the risks associated in putting Plaintiff's funds in these speculative securities.

54.   By reason of the conduct alleged herein, Defendants knowingly and/or recklessly, directly and indirectly have violated the UUSA in that they made untrue statements of material facts, and omitted to state material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, and engaged in a practice that worked a fraud or deceit on the Plaintiff.

55.   Moreover, the Defendants invested the Fund's assets outside of the permissible parameters of the Fund by investing in too much illiquid or restricted securities, by investing too much in one industry, and by investing with too much leverage.

56.   Defendants intentionally and fraudulently concealed that the level of risk and speculative nature of the derivatives and mortgage backed securities in which the Fund was concentrated.

57.   The false and fraudulent statements regarding the risks and characteristics of the Champion Income Fund constituted a scheme to defraud pursuant to the UUSA.

58.   It was the intention of the Defendants that the Plaintiff rely on these false statements and representations.

59.   The Plaintiff reasonably and justifiably relied on the truth of the statements made by Defendants when she initially invested in the Fund, when she made additional purchases in the Fund, and when she continued to stay invested in the Fund.

60.     As a direct and proximate result of Defendants' fraudulent course of conduct, the Plaintiff suffered financial damage in an amount in excess of $130,000 plus loss of interest.

61.     Defendants OFI and OFDI should be jointly and severally liable to the same extent as Defendant Manioudakis, as OFI and OFDI directly and indirectly controlled Manioudakis' conduct and actions.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.      actual damages, pursuant to N.J. Stat. § 49:3-71;

b.      Interest, pursuant to N.J. Stat. § 49:3-71;

c.      costs, pursuant to N.J. Stat. § 49:3-71;

d.      attorneys' fees; and

e.      such other and further remedy that the Court deems just and equitable.

## COUNT II - Common Law Fraud
(Plaintiff v. All Defendants)

62.     Plaintiff Josephine Duenas and realleges paragraphs 1 through 61 as though fully stated herein as paragraph 62.

63.     The Defendants misrepresented the level of risk associated with the Champion Income Fund by portraying the Fund as not having "undue risk", by representing that it would be "appropriate as a part of a retirement plan portfolio", and by representing the Fund as being well-diversified.

64.     In fact, the Champion Income Fund was extraordinarily risky and lost approximately 80% of its value in less than one year.

65.     The Defendants knew the aforesaid statements were false at the time they were made to Plaintiff.

66.     The Defendants made the false statements with the intent to induce the Plaintiff to invest money in this Fund and to keep the money invested in the Fund as the Fund took on excessive risk.

67.     The Plaintiff relied on the truth of the statements made by Defendants when she initially invested in both Funds, when she made additional purchases in the Fund, and when she continued to stay invested in the Champion Income Fund.

68.     As a result of the reliance on the aforesaid false statements, the plaintiff suffered financial loss.

69.     Furthermore, Defendants conduct was willful and malicious and a violation of trust and confidence.

        WHEREFORE, the plaintiff prays for judgment against the defendants for:

        a.      actual damages;

        b.      attorney fees;

        c.      reasonable costs; and

        d.      any other remedy that the Court deems just and equitable.

### COUNT III – Negligent Misrepresentation
(Plaintiff v. All Defendants)

70.     Plaintiff Josephine Duenas restates and realleges paragraphs 1 through 69 as though fully stated herein as paragraph 70.

71.     The Defendants are in the business of supplying information in that they provide information (albeit, incomplete and misleading information) to investors to make decisions about the funds that they are purchasing.

72.     The Defendants had a duty to supply accurate information to the Plaintiff about the risks

and characteristics of the Champion Income Fund.

73.   The Defendants failed that duty to supply accurate information and misrepresented the

level of risk associated with this Fund by portraying them as not having "undue risk", by

representing that it would be "appropriate as a part of a retirement plan portfolio", and by

representing the Fund as being well-diversified.

74.   The aforementioned statements were false and misleading.

75.   The Defendants made the false statements with the intent to induce the Plaintiff to invest

money in the Champion Income Fund and to keep the money invested in the Fund as the

Fund took on excessive risk.

76.   The Plaintiff relied on the truth of the statements made by Defendants when she initially

invested in the Fund, when she made additional purchases in the Fund, and when she

continued to stay invested in the Champion Income Fund.

77.   As a direct and proximate result of the reliance on the aforesaid false statements, the

plaintiff suffered financial loss.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.   actual damages;

b.   attorney fees;

c.   reasonable costs; and

d.   any other remedy that the Court deems just and equitable.

## <u>COUNT IV – Negligent Supervision</u>
(Plaintiff v. OFI and OFDI)

78.   Plaintiff Josephine Duenas restates and realleges paragraphs 1 through 77 as though fully

stated herein as paragraph 78.

79.   At all times relevant, Defendants OFI and OFDI had duties to supervise its agents and registered representatives, including Defendant Manioudakis, to protect their customers.

80.   Defendants OFI and OFDI had a duty to provide procedures and policies to supervise Manioudakis to ensure that he invested the Fund's assets properly and within the confines of the Fund's investment parameters as outlined in the Fund's Prospectuses and Statements of Additional Information.

81.   Defendants OFI and OFDI breached its duty to its customers, including Plaintiff, by the following acts or omissions:

   a.   Failing to adequately supervise Defendant Manioudakis;

   b.   Failing to establish adequate and/or written procedures to supervise and monitor the conduct of Defendant Manioudakis;

   c.   Failing to enforce its supervisory procedures and policies to monitor the conduct of Defendant Manioudakis; and

   d.   Failing to ensure that Manioudakis' trading strategy was proper in light of the investment objectives of the Fund.

82.   As a direct and proximate result of Defendant OFI's and OFDI's breach of their duties, the plaintiff suffered financial damage, plus loss of interest.

   WHEREFORE, the plaintiff prays for judgment against the defendants for:

   a.   actual damages;

   b.   attorney fees;

   c.   reasonable costs; and

   d.   any other remedy that the Court deems just and equitable.

## COUNT V – Colorado Consumer Protection Act
### (Plaintiff v. All Defendants)

83.   Plaintiff Josephine Duenas restates and realleges paragraphs 1 through 82 as though fully

stated herein as paragraph 83.

84.   At all times material herein, there existed in the State of Colorado, a statute entitled the

Consumer Protection Act ("CPA"), C.R.S. § 6-1-101 *et seq*, which provides:

> (e) Knowingly makes a false representation as to the characteristics, ingredients, uses,
> benefits, alterations, or quantities of goods, food, services, or property or a false
> representation as to the sponsorship, approval, status, affiliation, or connection of a
> person therewith;
> ***
> (g) Represents that goods, food, services, or property are of a particular standard, quality,
> or grade, or that goods are of a particular style or model, if he knows or should know that
> they are of another;
> ***
> (u) Fails to disclose material information concerning goods, services, or property which
> information was known at the time of an advertisement or sale if such failure to disclose
> such information was intended to induce the consumer to enter into a transaction.

C.R.S. § 6-1-105 (2008).

85.   Defendants used deception, false promises, and misrepresentations to hide the full risks

of the Champion Income Fund.

86.   Moreover, the Defendants invested the Fund's assets outside of the permissible

parameters of the Fund by investing in too much illiquid or restricted securities, by

investing too much in one industry, and by investing with too much leverage.  This also

constitutes deceptive or unfair practices in violation of the Consumer Protection Act.

87.   Defendants intentionally and fraudulently concealed that the level of risk and speculative

nature of the derivatives and mortgage backed securities in which the Champion Income

Fund were concentrated.

88.   This deceptive practices were made in the course of the Defendants' business, which is to

Case 1:11-cv-02631-JLK   Document 1   Filed 10/07/11   USDC Colorado   Page 21 of 22


manage, sell, and distribute financial products like the Champion Income Fund.

89. The losses in the Champion Income Fund not only affected to the Plaintiff, but it affected thousands of other investors. This deceptive practice significantly impacted the public as actual consumers of the Defendants' products and services.

90. The false and fraudulent statements regarding the risks and characteristics of the Fund constituted a deceptive act or practice pursuant to the Consumer Fraud Act.

91. The aforesaid course of conduct of the Defendants arose out the Plaintiff's dealings with Defendants in pursuit of financial security, and as such, was involved in trade or commerce.

92. It was the intention of the Defendants that the Plaintiff rely on these false statements and representations.

93. As a direct and proximate result of Defendants' fraudulent course of conduct, the Plaintiff suffered financial damage in an amount in excess of $130,000 plus loss of interest.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a. actual damages, pursuant to C.R.S. § 6-1-113;

b. treble damages, pursuant to C.R.S. § 6-1-113;

c. attorney fees, pursuant to C.R.S. § 6-1-113;

d. reasonable costs, pursuant to C.R.S. § 6-1-113: and

e. such other and further remedy that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,


s/ David Neuman

One of the Plaintiff's Attorneys

David Neuman
Stoltmann Law Offices, P.C.
10 S. LaSalle St., Suite 3500
Chicago, IL 60603
Tel: (312) 332-4200
Fax: (312) 332-4201
daveneuman@stoltlaw.com